## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | |
| **MIDWEST PROPERTIES OF** | : | |
| **SHAWANO, LLC,** | : | |
| *et al.* | : | Case  No.  10-12481 (KJC) |
| Debtor | : | (Re: D.I.  92) |

| | | |
|---|---|---|
| In re | : | |
| **MIDWEST OIL OF MINNESOTA,** | : | Chapter 11 |
| **LLC** | : | |
| | : | Case No. 10-12771 (KJC) |
| Debtor | : | (Re: D.I. 33) |

## <u>MEMORANDUM</u>[1]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

On October 7, 2010, the United States Trustee ("UST") filed a motion for an order

converting or dismissing the chapter 11 case or appointing a chapter 11 trustee in the bankruptcy

case for Midwest Properties of Shawano, LLC ("Midwest Properties")(D.I. 92).  On October 13,

2010, the United States Trustee filed a similar motion in the bankruptcy case for Midwest Oil of

Minnesota, LLC ("Midwest Oil")(D.I. 33) (jointly, the "UST Motions"). The UST alleges that

cause exists to convert or dismiss the cases pursuant to 11 U.S.C. §1112(b) because there is (i)

continuing loss to the estates and an absence of a reasonable likelihood of rehabilitation, and (ii)

gross mismanagement of the estates.  (*See* 11 U.S.C. §1112(b)(4)(A) and (B)).  The UST also

---

[1]This Memorandum constitutes the findings of fact and conclusions of law, required by
Fed.R.Bankr.P. 7052.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and
157(a).  This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(A).

asserts an additional ground for conversion or dismissal of the Midwest Oil case under

§1112(b)(4)(C), due to Midwest Oil's failure to maintain appropriate insurance on one of its

properties.[2] Fox Communities Credit Union ("FCCU") filed a joinder to the UST Motion in the

Midwest Properties case (D.I. 109). The Debtor objects to the relief requested in the UST

Motions.

A hearing to consider the UST Motions was held on November 8, 2010.  For the reasons

set forth below, the bankruptcy cases of Midwest Properties and Midwest Oil will be dismissed.

## BACKGROUND

1.    Midwest Properties.

Midwest Properties filed a voluntary chapter 11 bankruptcy petition on July 13, 2010 in

the Bankruptcy Court for the Eastern District of Wisconsin.  On August 6, 2010, the case was

transferred to this Court.[3]  On September 1, 2010, the UST filed a statement indicating that an

official committee of unsecured creditors had not been formed, due to insufficient interest.

Midwest Properties is a holding company, created in 2004, and its assets consist mainly

of more than 20 parcels of real property located in Shawano, Wisconsin.  Seven of the properties

are rented, two are in receivership, and the remaining properties are vacant.  (*See* UST Ex. 8 and

---

[2] At the hearing on November 8, 2010, however, Midwest Oil provided a copy of an insurance binder dated November 4, 2010, demonstrating that it had obtained property insurance and general liability insurance on the property located at 3355 Hadley Avenue, Oakdale, Minnesota. (Midwest Oil Ex. 4).

[3] Both cases were assigned initially to Judge Kevin Gross, since the debtors' prior filings were still open chapter 11 cases at the time of the transfer of the Midwest Properties case and the filing of the Midwest Oil case.  After the debtors filed a motion to recuse Judge Gross (*see* D.I. 37 in the Midwest Properties case, and D.I. 14 and 15 in the Midwest Oil case), and in light of various pending matters requiring immediate attention, Judge Gross transferred the cases to me.  (*See* D.I. 108 in the Midwest Properties' case, and D.I. 42 in the Midwest Oil case.).

Midwest Properties Exs. 2 and 3). Midwest Properties' income is derived from the rent paid by

the tenants of its rented properties. Midwest Properties' expenses in connection with the

properties include monthly mortgage payments, insurance, and utility costs. Midwest Properties

has no paid employees. Naomi Isaacson, the managing member of Midwest Properties, performs

management tasks for the debtor, its parent company - - the R.C. Samanta Roy Institute of

Science and Technology, Inc. ("SIST") - - and other affiliated companies. Because SIST is a

non-profit company, other individuals often volunteer their time to perform tasks for Midwest

Properties. (Tr. at 23-25).[4]

     a.     <u>The Receivership Properties.</u>

Midwest Properties' schedules include real properties located at 463 N. Humphrey Circle,

Shawano, Wisconsin, and 1024 East 5th Street, Shawano, Wisconsin, consisting of two eight-unit

apartment buildings, that are subject to state court  receivership orders (the "Receivership

Properties"). (*See* UST Ex. 1, Schedule A and Statement of Financial Affairs, question 6).

Midwest Properties is not receiving any rental income and is not paying any mortgage obligations

or other expenses in connection with the Receivership Properties. (*See* Tr. at 25-26).

Midwest Properties purchased the Receivership Properties from Robert and Shannon

Broder (the "Broders") pursuant to a Land Contract dated July 30, 2004. (Midwest Properties

Ex. 11). The Land Contract recited that the Broders' interest in the Receivership Properties was

encumbered by a mortgage and required Midwest Properties to pay the bank directly. (*Id.* at ¶13).

Attached as Exhibit B to the Land Contract is a "Consent and Agreement Regarding Release of

Senior Mortgages" signed by Business Lending Group, a credit union service organization, in

---

[4]Transcript citations herein refer to the transcript of the November 8, 2010 hearing.

which it agreed, among other things, (i) that the Land Contract conveyance was not a default under the mortgage, and (ii) that Midwest Properties' payments would be credited against the outstanding mortgage obligation. (*Id.*, Ex. B). Midwest Properties began making monthly payments of $5,000 to Fox Communities Credit Union ("FCCU"),[5] but at some point, Midwest Properties began making payments under the Land Contract directly to the Broders instead. (Midwest Properties Ex. 10). The Broders defaulted on the FCCU mortgage loan. By order of the State of Wisconsin Circuit Court, Shawano County (the "State Court") dated September 10, 2008, a foreclosure judgment was entered against the Broders, and the attorney for FCCU was appointed as a receiver to collect the rents and pay the expenses in connection with the Receivership Properties. (*See* Fox Ex. C-3). On February 6, 2009, the State Court entered a foreclosure judgment against Midwest Properties. (*See* Fox Ex. C-4).

2.     Midwest Oil.

On September 2, 2010, Midwest Oil filed a voluntary chapter 11 bankruptcy petition in this Court. On September 17, 2010, the UST filed a statement indicating that an official committee of unsecured creditors had not been formed due to insufficient interest.

Midwest Oil is a holding company that was created in 2003. Its assets consist of four parcels of real property located in Minnesota. Three of the properties are commercial and one is a four-unit apartment house. Midwest Oil's income is derived from rent paid by tenants of the real properties. Midwest Oil's monthly expenses consist of the payment due under a land contract for one of its properties, and mortgage payments on the remaining properties. As with

---

[5]The relationship between Business Lending Group and FCCU is not clear from the record, but the parties do not dispute that FCCU is the mortgagee for the Receivership Properties.

Midwest Properties, Midwest Oil has no paid employees.  Ms. Isaacson performs certain administrative tasks for Midwest Oil, and other people volunteer to perform other tasks.  (Tr. at 85-86).

3.      Previous bankruptcy filings.

On March 16, 2009, Midwest Properties, Midwest Oil, SIST, and other affiliated companies (jointly, the "2009 Debtors"), filed voluntary chapter 11 bankruptcy petitions in this Court (the "2009 Case").  By Order dated March 20, 2009, the 2009 Case was jointly administered under Case No. 09-10876.

On September 16, 2009, the Court entered an Order requiring the 2009 Debtors to show cause why the Court should not dismiss the cases or appoint a chapter 11 trustee.  (*See* Case No. 09-10876, D.I. 283).  On September 22, 2009, the Court entered an Order dismissing the 2009 Case (the "2009 Dismissal Order")(*see* Case No. 09-10876, D.I. 291), under Bankruptcy Code §1112(b)(4) for, *inter alia*, the following reasons: continuing losses to the debtors based upon the monthly operating reports, absence of a plan to rehabilitate the debtors, lengthy inaction to obtain financing or other action to maximize the value of the assets, mismanagement, and failure to comply with the requirements of maintaining a chapter 11 case.  (*Id.*, Tr. at 112).  The Court determined that appointing a trustee was not in the best interests of creditors.

The 2009 Debtors appealed the 2009 Dismissal Order to the District Court for the District of Delaware (the "Delaware District Court") and obtained a stay of the Dismissal Order while the appeal was pending.  On May 25, 2010, the District Court affirmed the Dismissal Order.  (*See* District Court Case No. 09-789, D.I. 45).

The 2009 Debtors appealed the District Court's Order to the Court of Appeals for the

5

Third Circuit (the "Third Circuit")(*See* Third Circuit Case No. 10-2535). The 2009 Debtors'
motion for a stay pending the appeal to the Third Circuit was denied by order dated June 7, 2010
of the Delaware District Court, and by order dated July 1, 2010 of the Third Circuit. (*See also*
Tr. at 112-13). Midwest Properties and Midwest Oil moved for voluntary dismissal from the
appeal. By order dated August 3, 2010, the Third Circuit entered an order granting Midwest
Properties' and Midwest Oil's requests for voluntary dismissal from the appeal, and providing
that the appeal would continue as to the remaining 2009 Debtors.

In July 2010, Midwest Properties filed its current chapter 11 petition in the Bankruptcy
Court for the Eastern District of Wisconsin, which was transferred here. The Wisconsin
bankruptcy filing stayed a sheriff's sale of a property against which FCCU holds a lien. (*Id.*).

Also, in July 2010, Midwest Oil filed a chapter 11 bankruptcy petition in the Bankruptcy
Court for the District of Minnesota. Midwest Oil's Minnesota filing stayed a sheriff's sale of a
property against which Vermillion State Bank holds a lien. (*Id.* at 114). Upon motion of the
UST for Region 12, on August 18, 2010, the Minnesota Bankruptcy Court dismissed Midwest
Oil's bankruptcy case pursuant to Bankruptcy Code §1112(b)(1). On September 1, 2010,
Midwest Oil filed its current chapter 11 petition in this Bankruptcy Court.[6]

---

[6]To this date, the debtors have been unable to employ an attorney on their behalf who is admitted
to practice in this Court, and, at one point before transfer of the cases to me, Judge Gross precluded the
debtors from further filings until one was so engaged. (*See* D.I. 88 in the Midwest Properties case, and
D.I. 27 in the Midwest Oil case.) L.B.R. 9010-1(c). Ultimately, I waived this requirement to afford the
parties an opportunity to conduct a hearing on the UST Motions. Other matters are pending, but which
will now not be heard, including the following motions in the Midwest Properties case: (i) FCCU motion
for relief from the automatic stay and abandonment to resume foreclosure proceedings (D.I. 26), (ii) the
debtor's motion for turnover and accounting (D.I. 50), (iii) the debtor's motion to consolidate motions
and grant access to debtor (D.I. 68), and (iv) the debtor's motion to exclude unqualified expert testimony
(D.I. 39); and the following motions in the Midwest Oil case: (i) Motion of Vermillion State Bank for
relief from the automatic stay to allow for sheriff's sale of certain properties (D.I. 6), and (ii) Motion for
relief from the automatic stay filed by American Bank of St. Paul (D.I. 44).

## DISCUSSION

Bankruptcy Code §1112(b)(1) provides, in pertinent part, that, on the request of a party in interest, a court shall convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, for "cause." Section 1112(b)(4) contains a non-exclusive list of what constitutes "cause," including (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; [and] (B) gross mismanagement of the estate. The UST argues that such cause exists in both the Midwest Properties and the Midwest Oil cases.

As one court recently noted, the language of section 1112(b) was amended by Congress as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA"). *Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556, 560 (Bankr.M.D. Pa. 2007). The statutory language has been changed from the permissive (a court "may" convert or dismiss a case) to mandatory (a court "shall" convert or dismiss a case). *Id.* "The amendments to §1112 limit the Court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause." *Id.*

1.   Midwest Properties' case should be dismissed pursuant to §1112(b)(4)(A).

The UST prepared an exhibit listing each of Midwest Properties' real properties, the rent received from each property, the monthly mortgage obligations, and the real property taxes for each property. (UST Ex. 8) The UST prepared the exhibit from Midwest Properties' schedules, tax information provided by the debtor, and Ms. Isaacson's testimony at the §341 Creditors Meeting. (Tr. at 118-19). The exhibit does not include any monthly rental income or expenses related to the Receivership Properties.

7

UST Exhibit 8 shows that Midwest Properties receives total monthly rental income of $17,744, while the total monthly mortgage obligations are $18,648, and monthly property tax obligations are $6,483. Without even considering monthly utility and insurance costs, the UST argues that Midwest Properties is operating at a loss of at least $7,387 each month. (UST Ex. 8).

Midwest Properties prepared its own exhibits listing its real properties, rental income, and mortgage obligations. (*See* Midwest Properties Exhibits 2 and 3).[7] MWP Ex. 2 includes estimated rental income and mortgage obligations for the Receivership Properties, while MWP Ex. 3 does not. The information in the debtor's exhibits differs from UST Exhibit 8 as follows:

- Rent - Midwest Properties changed the amount of rental income received for at least five of the properties, both increasing or decreasing the figures, depending on whether there was a new lease or the figures needed to be corrected  (Tr. at 31-36, 42, 45-46)

- Mortgage for 635 S. Main Street: Ms. Isaacson testified that her exhibits need to be corrected to include a $2,000 monthly mortgage obligation for the property located at 635 S. Main Street. (Tr. at 37). She testified that this mortgage obligation was reduced from the amount provided to the UST at the §341 Creditors Meeting because she negotiated a reduction with the mortgage lender, although she admitted the agreement was not yet in writing. (*Id.*).

- Mortgage for 131/133 S. Main Street: Ms. Isaacson further testified that she excluded the mortgage obligation for the property located at 131/133 S. Main Street because that obligation was being paid directly by the tenant as additional rent.

- Real estate taxes: Midwest Properties' exhibits do not include real property taxes. At the November 8, 2010 hearing, Ms. Isaacson testified that the real property taxes are paid by its parent company, SIST, pursuant to a tax sharing agreement. (Tr. at 148-150). In 2009, SIST paid Midwest Properties' real property taxes in cash in the amount of $116,723.44. (*See* MWP Ex. 5). The UST argues that this conflicts with information provided at the §341 Creditors Meeting, at which time the UST was told that the debtor provided the funds used to pay the 2009 real property taxes. (UST Ex. 9 at 26-28).

---

[7]Midwest Properties' exhibits will be referred to herein as "MWP Ex. ___."

8

The totals in the debtors' exhibits (as corrected to include the 635 S. Main Street mortgage obligation) can be summarized as follows:

|  | Exhibit 2 - includes Receivership Properties | Exhibit 3 - excludes Receivership Properties |
|---|---|---|
| total monthly rental income | $25,058.34 | $17,258.34 |
| total monthly mortgage obligations (corrected) | $20,223.26 | $15,223.26 |
| Net amount available to Debtor | $4,722.08 | $2,035.08 |

MWP Ex. 4 calculates the average monthly utility and insurance expenses for the properties to be approximately $2,194.12. Even assuming that I accept all of the revised figures set forth in Midwest Properties' exhibits and assume that the real property taxes are paid by SIST, the debtor does not generate sufficient monthly rental income to pay its expenses unless the Receivership Properties are included in the calculation.

Midwest Properties argues that the state court receiver is required to turn over all rental income to it under Bankruptcy Code §543.[8]  Midwest Properties argues that, under Wisconsin law, it is the equitable owner of the Receivership Properties, regardless of the foreclosure judgments and appointment of a receiver. In response, FCCU argues that Midwest Properties' only recourse under state law at this stage of the proceedings is to "redeem" the property by paying the full amount of the foreclosure judgment, plus taxes, interest and costs, to the clerk of

---

[8]Midwest Properties has filed a Motion for Turnover and Accounting by FCCU and its Receiver (D.I. 50) and FCCU filed a response objecting to the relief requested and asking the Court to excuse it from turning over the properties and filing an accounting (D.I. 102).

court or the plaintiff.  Wis. Stat. §846.15.

The Seventh Circuit has recognized "the long-established general rule in Wisconsin that a mortgagee does not have the right to rents and profits, even though they have been assigned, until he gains actual or constructive possession or until a receiver is appointed." *Matter of Century Inv. Fund VIII Ltd. P'ship*, 937 F.2d 371, 376 (7th Cir. 1991) *citing Lincoln Crest Realty v. Standard Apartment Dev.*, 61 Wis.2d 4, 211 N.W.2d 501, 572 (1973).  Here, a receiver has been in place pursuant to a state court order since September 2008.  However, the Seventh Circuit noted that "the written contracts between Century and the Bank are crucial to the determination of property interests herein." *Id.* at 373.  The loan documents between the Broders and FCCU are not a part of this record and I cannot determine with certainty the parties' property rights regarding the Receivership Properties.  There was no evidence presented at the hearing on the UST Motions that the debtors had either asserted or exhausted any remedies available to them in state court.

However, if I were to assume that Midwest Properties is entitled to the rents from the Receivership Properties, then pursuant to MWP Ex. 2, the debtor would receive rental income in the amount of $4,722.08 each month after payment of the mortgage obligations, which is further reduced to $2,527.96 after payment of estimated utilities and insurance costs.  These figures are estimates, since Midwest Properties admits that it does not know the actual amount of rents collected from the Receivership Properties. However, it does not appear that net rental income of $2,500 per month would be sufficient to prevent substantial diminution to the estate, especially in light of Midwest Properties' assertion that it intends to fund a reorganization plan through its operations.  (Tr. at 54).

10

At the hearing, Midwest Properties failed to introduce any documentary evidence to demonstrate that it has a reasonable likelihood of reorganizing.  The debtor did not provide a draft plan, financial projections, new leases, development agreements, or written agreements with lenders to reduce its mortgage obligations.  Midwest Properties did not provide any evidence of locating - - or even attempting to locate - - a source of funding for the development or maintenance of the properties.  Ms. Isaacson described the debtor as "self-supporting," although it had only $5.00 in the bank at the time of the filing, and has been operating at a loss without the rents from the Receivership Properties.  (Tr. at 53-54).  Less than half of the properties owned by Midwest Properties are producing any income.  Some of the properties are not likely to be rented in the near future and Midwest Properties did not provide any details for a plan to improve or otherwise prepare those lots for renting (*e.g.*, the parking lot used at no cost by an affiliate (tr. at 39-40),  the vacant lot with woods (tr. at 47), ten vacant lots (tr. at 43), and the lot with a building that needs to be demolished (tr. at 47)).  Also, Midwest Properties has been unsuccessful in some of its recent efforts to rent other lots (*i.e.,* the debtor paid to fit-out one property as a tanning salon, then the tenant backed out of the deal) (Tr. at 44-45).

Ms. Isaacson apparently believes in the achievability of the debtors' aspirations, but "[c]ourts usually require [that] the debtor do more than manifest unsubstantiated hopes for a successful reorganization."  *In re 865 Centennial Ave. Assoc. Ltd. P'ship.,* 200 B.R. 800, 810 (Bankr.D.N.J. 1996)(citation omitted).  As recognized by the Third Circuit:

> However honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation. *Tennessee Publishing Co. v. American Nat'l Bank,* 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.3d. 13 (1936).  "There must be a reasonable possibility of a successful reorganization within a reasonable time frame. *United*

11

*Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988).

*First Jersey Nat'l Bank v. Brown (In re Brown)*, 951 F.2d 564, 572 (3d Cir. 1991). Midwest Properties has not provided any evidence that a realistic plan could be proposed within a reasonable time frame.

Moreover, Midwest Properties' lack of cooperation with the UST's requests for basic documentation is troubling. At the §341 Creditors Meeting ,the UST requested copies of Midwest Properties' rent logs and bank statements. Although the debtor acknowledged that such documents existed and agreed to provide those documents, curiously, it did not produce these documents to the UST and, instead, filed a motion for a protective order. (Tr. at 77-79).[9] Disclosure is a fundamental component of the bankruptcy process. Midwest Properties' lack of candor provides further reason to question Midwest Properties' ability to reorganize within a chapter 11 framework.

For all of the foregoing reasons, I conclude that Midwest Properties' bankruptcy case should be dismissed for cause pursuant to §1112(b)(4)(A). I consider dismissal to be in the best interests of creditors and the estate, rather than conversion to chapter 7 or appointing a chapter 11 trustee pursuant to §1104, because the evidence shows that the debtor's operations without the Receivership Properties do not generate sufficient funds to pay current expenses, and a trustee would simply add more costs and burden to the estate. It seems impractical, under these circumstances, for a trustee located here to administer real estate in Minnesota and Wisconsin.

---

[9]As argued by the UST at the hearing, Midwest Properties' failure to respond to the UST's reasonable requests for information also provides "cause" for dismissal pursuant to §1112(b)(4)(H).

12

2.     <u>Midwest Oil's case should be dismissed pursuant to §1112(b)(4)(A).</u>

UST Exhibit 13 lists four properties owned by Midwest Oil, along with the amount of rent received monthly, and the mortgage obligation due monthly, for each property. The exhibit shows that the monthly rental income paid to Midwest Oil totals $12,450, while the monthly mortgage obligations total $14,418, for a continuing loss of $2,031 each month. UST Exhibit 13, however, does not include any mortgage payments due on the property located at 2611 Bridge Avenue, Albert Lea, Minnesota (the "Bridge Avenue Property") or at 3355 Hadley Avenue, Oakdale, Minnesota (the "Hadley Avenue Property") because the debtor disputes its obligations under those loans.[10] UST Exhibit 13 also shows that the real property tax obligations are delinquent for three of the four properties.

In response, Midwest Oil Exhibit 16 shows that the debtor receives monthly rental income for the properties of $19,900, and owes monthly mortgage obligations of $17,184.60, leaving a net profit each month of $2,715.40.[11] Ms. Isaacson testified that the exhibit includes additional rental income of $7,500 because Midwest Oil is negotiating a lease to rent part of the Bridge Avenue Property.

MWO Ex.16 lists the monthly mortgage obligations for three of the properties as follows:

-     the Bridge Avenue Property at $2,500 per month,

-     the Smith Avenue Property at $2,000 per month,[12] and

---

[10]Pursuant to the loan documents, Midwest Oil should pay $8,811 monthly on the Bridge Avenue Property. (Tr. at 89).

[11]The Midwest Oil exhibits will be referred to herein as "MWO Ex. ___."

[12]The Smith Avenue Property is located at 365/67 Smith Avenue North, St. Paul, Minnesota (the "Smith Avenue Property").

'       the Hadley Avenue Property at $2,266.79 per month.

Ms. Isaacson testified that these mortgage amounts are not based on the respective loan documents; instead, MWO Ex.16 reflects the monthly mortgage amounts that Midwest Oil *proposes to pay* after renegotiating the mortgage loans or land contracts, (tr. at 88-91, 101-02) as follows:

- The Smith Avenue Property:  The Smith Avenue Property was purchased by a land contract and Ms. Isaacson testified that the contract holder has agreed to accept $2,000 per month, although this agreement is not in writing or formalized in any way yet.  (Tr. at 91).

- The Bridge Avenue Property:  Ms. Isaacson testified that she had "numerous discussions with the bank officer" about reducing the payments made to American Bank of St. Paul ("American Bank") on the Bridge Property, but the loan is in dispute and there is no agreement (Tr. at 89).  After the November 8, 2010 hearing, counsel for American Bank filed a letter brief (D.I. 94), confirming that American Bank has not agreed to accept the lower monthly payment proposed by Midwest Oil.[13]

The Hadley Avenue Property faces different challenges. Midwest Oil acquired the Hadley Avenue Property, which includes a vacant gas station, at a tax forfeiture sale.  (Tr. at 92). Midwest Oil was renovating the property to be occupied by Midwest Oil of Anoka ("Anoka"), an affiliated company, and tenant at another Midwest Oil property, when the Hadley Avenue

---

[13]American Bank's post-hearing letter brief notes that American Bank filed a motion for relief from the automatic stay to commence a state court foreclosure action regarding the Bridge Avenue Property because the debtor has not made any mortgage payments for more than a year.

14

Property was vandalized, damaging electrical, plumbing and other systems on the property. (Tr. at 92-93). Midwest Oil submitted a damage claim in the amount of $230,435 to its insurance company on August 7, 2009, but the claim has not been resolved. (Midwest Oil Ex. 5). Midwest Oil is still in the process of cleaning up an environmental problem on this property, which Midwest Oil hopes is in the last stages of monitoring. (Tr. at 94). Any proposed time frame for renting the property is speculative. (*Id.* at 94-95). Moreover, Ms. Isaacson testified that Vermillion Bank, which holds a lien against the property, has prevented Midwest Oil from renting the property. (Tr. at 93).

Midwest Oil received an offer from Walgreens to purchase the Hadley Avenue Property for approximately $2.5 million, but the debtor rejected the offer in the hope of getting a higher price, even thought a recent appraisal of the property obtained by Midwest Oil valued the property at $2,550,000. (Tr. at 95-96, MWO Ex. 6). Ms. Isaacson testified that the property could not have been sold to Walgreens at this time due to the remaining environmental issue, but the debtor believes Walgreens is still interested in the property and hopes to renegotiate with Walgreens as part of an overall reorganization plan. (*Id.* at 97-99).

Midwest Oil has no income other than the monthly rental payments it receives from its properties. (Tr. at 86). If I accept Midwest Oil's asserted rental income amount of $19,900 per month, and accept that it will be successful in reducing the monthly payment on the Smith Avenue Property to $2,000, then the debtor's monthly mortgage obligations (without even considering the disputed Vermillion Bank loan on the Hadley Avenue Property) will be

$21,228.[14]   Still, Midwest Oil would be operating a loss of $1,328 monthly.

As shown on Midwest Oil's Schedule E, the real property taxes on some of the Midwest Oil properties are delinquent. (UST Ex. 10).  In particular, although Anoka paid a recent tax installment due in October 2010 for the Bridge Avenue Property, older real property taxes in the amount of approximately $38,000 have not been paid because the property has not been leased. (Tr. at 66-67).   Real property taxes due on the Smith Avenue Property in the amount of $14,131 have not been paid.  Although Ms. Isaacson testified that SIST would pay them, it has not done so.  (Id.).  Finally, the real property taxes on the Hadley Avenue Property, in the amount of more than $88,000, are delinquent, but Midwest is contesting the amount of those taxes.  (Id. at 67-68).

The record before me demonstrates that Midwest Oil is operating with a monthly loss of at least $1,328, and is delinquent in payment of the property taxes.  There is clearly a continuing loss and diminution to the Midwest Oil bankruptcy estate.  Moreover, like Midwest Properties, Midwest Oil did not provide any documentary evidence at the hearing showing that there is a reasonable likelihood the debtor can be rehabilitated.  Midwest Oil did not provide a draft plan, financial projections, or written agreements with lenders to reduce its mortgage obligations. Midwest Oil submitted an appraisal of the Hadley Avenue Property and testimony regarding a potential sale to Walgreens, yet it appears unwilling to sell the property at a price close to the appraised value.  Further, it appears that a sale to Walgreens is unlikely to occur until the environmental issues are resolved, and no concrete time table for that was established.  As stated above in connection with Midwest Properties, the debtor must provide more than

---

[14]The monthly mortgage obligations for the Midwest Oil properties would include $10,500 for the property at 236 Grand Avenue, $2,000 for the Smith Avenue Property, and $8,811 for the Bridge Avenue Property, for a total of $21,228.

16

"unsubstantiated hopes for a successful reorganization." *See Centennial*, 200 B.R. at 810. The record before me does not provide any basis for concluding that Midwest Oil has a reasonable likelihood of rehabilitation within a reasonable time frame.

3.    Unusual circumstances.

Section 1112(b)(1) provides that the court shall convert or dismiss a case unless there exist "unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate." 11 U.S.C. §1112(b)(1). In their pleadings and post-hearing briefs, Midwest Properties and Midwest Oil argue that the Court must consider the unusual circumstances present here. In its post-hearing brief for Midwest Properties, the debtor writes:

> The Debtors had no financial problems until Lorna Marquardt, the mayor of Shawano, and other city officials started their racial discrimination campaign by interfering with this Debtor's business affairs with a strategy to destroy this Debtor's financial power and force them to leave the City. Creditors such as FCCU are using these political issues to destroy this Debtor and are engaging in conduct totally contrary to the law. This massive racial discrimination campaign needs to be investigated by this Court. At this time, the Debtor has requested investigation by the Senate Investigation Committee, Judiciary Committee, and the United Nations. Additionally, Debtor has requested that the Indian government pressure Secretary of State Hillary Clinton and the Justice Department to do an investigation into this matter.

> The Court cannot ignore the underlying racial discrimination and prejudice that has put this Debtor into bankruptcy. This is not a case of bad faith. It is a case of intentional bad publicity which [UST analyst] Heck and the U.S. Trustee are using against this Debtor. In what other case in history have representatives of the U.S. Trustee's office come to the table with a whole pile of negative propaganda pieces. Thereafter, the U.S. Trustee files a motion to dismiss by conjuring up a whole host of reasons which have no bearing in reality or fact. If the U.S. Trustee office was operating as they are supposed to be for the benefit of all creditors, they would have sought turnover of the property from FCCU long ago. Rather their purpose is to perpetuate racial discrimination under the color of law. Of important note, no creditor besides FCCU has objected to Midwest Properties bankruptcy filing or joined in the request of the U.S. Trustee for dismissal or brought a motion for relief from stay.

17

(Midwest Properties' post-hearing letter brief, D.I. 138). Midwest Oil's post-hearing brief

contains virtually identical language, but asserts that "[c]reditors such as American Bank and

Vermillion Bank are using these political issues to destroy this Debtor and are engaging in

conduct totally contrary to the law." (Midwest Oil's post-hearing letter brief, D.I. 100).[15]

Despite the allegations raised in certain pleadings and the debtors' letter briefs, the

debtors did not provide any credible evidence in support of these serious allegations. At the

November 8, 2010 hearing, Jeffery Heck, a bankruptcy analyst with the UST's Office, testified

that in preparing for the §341 Creditors Meeting and for the hearing on the UST Motions, he did

not have any contact with anyone from Shawano, Wisconsin (other than the debtors'

representatives), either by telephone, e-mail, or otherwise. (Tr. at 119-20, 123-24). Mr. Heck did

attempt to contact that Shawano tax office for information, but he did not have a conversation or

get information from anyone at the tax office. (*Id.* at 124). I found Mr. Heck's testimony to be

credible. There was no evidence whatsoever that Mr. Heck's work was influenced by any

prejudice the debtors claim to be suffering in Shawano.

Further, the debtors incorrectly assert that the basis for the UST Motions have no bearing

in reality or fact. To the contrary, the evidence establishes that Midwest Properties and Midwest

Oil currently are operating each month at a loss. The debtors have not provided any credible

evidence showing that Midwest Properties or Midwest Oil are formulating a plan to reorganize

successfully.

The UST has also made allegations of gross mismanagement. The debtors have failed to

---

[15] These allegations are repeated in acrimonious detail in the complaint filed by the Midwest Properties against FCCU and a number of other defendants (Adv. No. 10-55536). *See also* the complaint filed by Midwest Oil (Adv. No. 10-55936).

cooperate with the UST by refusing to provide basic financial documents such as rent logs or bank statements, and, at the time the UST Motions were drafted, the information available to the UST showed that the debtors had not paid their real property tax obligations, had not filed federal income tax returns, and did not have current insurance on one of Midwest Oil's properties. The record before me does not support a finding that there are unusual circumstances warranting denial of the UST Motions.

The debtors argue that there is no basis for finding that the bankruptcy case filings were made in bad faith. The Third Circuit has determined that "chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. §1112(b) unless filed in good faith, and the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith." *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004). The Third Circuit decided:

> [A good faith standard] furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimatize the delay and costs imposed upon parties to a bankruptcy. Requirement [sic] of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way . . . .

*Id.*, at 119 *quoting In re SGL Carbon Corp.*, 200 F.3d 154, 161-62 (3d Cir. 1999). When considering whether a case is filed in good faith, the Third Circuit has focused on two inquiries: (1) whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage. *Id.* at 120 *citing SGL Carbon*, 200 F.3d at 165-66.

Judge Gross of this Court dismissed the previous chapter 11 bankruptcy petitions filed by Midwest Properties and Midwest Oil after determining that the debtors: (i) were suffering

19

continuing losses, (ii) had no plan for rehabilitation, (iii) had not taken any action to obtain financing or to maximize the value of the assets, (iv) mismanaged the estates, and (iv) failed to comply with the requirements of maintaining a chapter 11 case. The record before me does not indicate that much has since changed. Midwest Properties' and Midwest Oil's current chapter 11 petitions were filed shortly after the automatic stay for the previous cases was lifted, and on the eve of foreclosure actions in state court. Despite the earlier case dismissals, the debtors still have not demonstrated that they have a viable plan (or that they are developing a viable plan) that will preserve the debtors as going concerns by reorganizing their business affairs, or that will maximize the value of the estates for creditors.

Instead, the timing of the bankruptcy filings indicate the debtors' intent to block the secured creditors' state court actions and move them to this Court. "Congress intended that the filing of a chapter 11 petition and the coincident triggering of the automatic stay would afford debtors a 'breathing spell' from 'all collection efforts, all harassment, and all foreclosure actions.'" *Fields Station LLC v. Capitol Food Corp of Fields Corner (In re Capitol Food Corp. of Fields Corner)*, 490 F.3d 21, 25-26 (1st Cir. 2007) *quoting* H.R.Rep. No. 95-595 at 340 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 at 6296-97. Even so, the Third Circuit has noted:

> The protection of the automatic stay, however, is not *per se* a valid justification for a Chapter 11 filing; rather it is a consequential benefit of an otherwise good faith filing. As such, courts universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation, and any perceived benefit of the automatic stay, without more, cannot convert a bad faith filing to a good faith one.

*Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Memorial Corp.)*, 589 F.3d 605, 620 (3d Cir. 2009) *citing Integrated Telecom*, 384 F.3d at 128.

The debtors have not demonstrated that their petitions were filed in accordance with the

20

purposes of the Bankruptcy Code: *i.e.,* to preserve going concern value and maximize the value of the debtor's estate. There are no employees or business that the debtors are seeking to continue, no financial projections or valuations to provide evidence of a plan that would maximize value for creditors. In post-hearing letter briefs, the debtors have asked this Court to investigate their claims of prejudice. Even if there could exist a set of circumstances under which this Court could oversee such an investigation, these chapter 11 proceedings do not provide, under these circumstances, an appropriate platform for such an investigation.

4.    <u>Barring future bankruptcy filings.</u>

In the UST Motions, the UST requests that the cases be dismissed with prejudice, barring the debtors from refiling bankruptcy petitions for one year. While the debtors have filed previous bankruptcies, I cannot conclude that the circumstances warrant dismissal with prejudice. It may be that, at some future time, the debtors are able to realize enough of their aspirations to propose confirmable plans. However, the debtors' continuing failure to obtain local counsel in accordance with the local rules has created difficulties in administering these bankruptcy cases. Therefore, although this dismissal will not include a general bar to refiling, Midwest Properties and Midwest Oil will be barred from filing any further pleading or petitions in this Court unless filed by counsel admitted to practice in this jurisdiction in accordance with L.B.R. 9010-1.[16]

---

[16] No creditor moved to transfer the venue of these cases and, while the statutory requisites for filing in this district may have been met (this, I do not decide), the debtors' connections to Delaware seem somewhat attenuated and I would not necessarily expect any future filing to take place in this district.

<u>CONCLUSION</u>

The record before me shows that Midwest Properties and Midwest Oil are currently operating at a loss.  Neither debtor has provided any evidence to demonstrate an ability to change the continuing losses to the estate nor have they demonstrated a reasonable likelihood of rehabilitation in a reasonable time.  These chapter 11 filings constitute a desperate attempt by the debtors to escape perceived, but unproven, bias in their "hometowns"and to save their properties from receivership and foreclosure, but without the demonstrable ability to reorganize.

Accordingly, both cases will be dismissed pursuant to 11  U.S.C. §1112(b)(4)(A).

An appropriate Order will be entered.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: December 20, 2010